UNITED STATES FIDELITY & GUARANTY CO. *v.* MUNROE.

PRINCIPAL AND SURETY.—GUARDIAN AND WARD—BOND—EXPENSES OF ATTORNEY'S SERVICES—DAMAGES.

Attorney's fees paid out by a surety on the bond of an infant's general guardian, in getting a settlement from the guardian of defalcations committed by such guardian, who was shown to have only an incumbered interest in real property, worth less than the funds appropriated, and a dower interest in real property owned by her ward, were, as a matter of law, necessarily incurred and were recoverable under the terms of the surety's contract, from the principal.

Error to Wayne; Donovan, J. Submitted April 6, 1911. (Docket No. 25.) Decided May 8, 1911.

Assumpsit by the United States Fidelity & Guaranty Company against Mary F. Munroe on a written guaranty. Judgment for defendant. Plaintiff brings error. Reversed.

*Moore & Moore* and *Samuel W. Burroughs*, for appellant.

*A. B. Hall*, for appellee.

HOOKER, J.   Defendant, being appointed guardian of her minor son, procured plaintiff to sign her bond, and, as an inducement and part of the consideration, executed an application and guaranty, in which she agreed and promised to pay the premium, and,—

"To furnish said company with copies of all important papers connected with the settlement of the estate; to indemnify and keep indemnified the said company from and against any and all loss, costs, charges, suits, damages, counsel fees, and expenses, of whatever kind or nature, which said company shall or may, from any cause, at any time, sustain or incur, or be put to, for, or by reason of, or in consequence of, said company having entered into or executed said bond; to permit said company or its representative to examine them at all reasonable times; not to sell, dispose of, or convert any of the assets of the estate into cash without an order of court having jurisdiction first had and obtained; to deposit all moneys and funds belonging to the estate now on hand, and also such moneys and funds as may come into my hands from time to time during the administration of said estate from any source whatever in the bank or banks aforesaid, such money to be withdrawn only upon checks drawn by me in fiduciary capacity; to keep just, true, and accurate papers and books of account of my said trust, which papers and books of account shall at all reasonable times be open to the free and full inspection and examination of the representative of said company; to furnish said company with reports from time to time of receipts and disbursements; to substitute, in the event of my failure to comply with any condition or covenant herein, other sureties on the bond herein applied for, within 15 days after notice given me by said company of my default, and said company returning the unearned premium; to pay all costs and expenses said company may incur in obtaining a release or discharge as surety upon this bond herein applied for, in case I fail to substitute other sureties as hereinbefore set forth; and at the termination of my trust to furnish said company with satisfactory and conclusive

evidence that said trust has been faithfully and legally executed, and all persons interested paid. And I do further covenant and agree that I will at all times keep the funds of the estate separate from my private property; that I will not mingle them with any other property intrusted to my care; that the estate shall always be in such a condition that it can easily be identified; that I will not use any of said funds for my own purpose, and will in all transactions strictly comply with the orders of the court and the requirements of the law in settlement of said estate."

The bond was signed on November 13, 1901. Defendant's first account was filed July 8, 1905, whereupon, after examining the same, plaintiff was advised by counsel to ask to be released from subsequent liability upon the bond, and caused a petition to be filed to that end on August 29, 1905. An order to show cause issued, and a hearing was continued to September 12, 1905, when defendant tendered her resignation, which was accepted, which made further action upon the petition unnecessary. On October 26, 1905, defendant filed a second and final account, which apparently covered the first, and was the only one considered. In it she claimed that she had used of the ward's money only $1,243.47. George B. Yerkes, as guardian *ad litem* for the ward, filed objections, in which he claimed that defendant had appropriated to her own use the ward's money to the amount of $14,956. Several hearings were had, in which Yerkes acted for the ward, Mr. Maloney for the defendant, and Moore & Moore for plaintiff. The court finally found that defendant had appropriated to her own use $9,700, for which amount plaintiff was then liable to the ward upon the bond. It appeared that the defendant's property consisted only of a piece of land covered by a mortgage and a dower interest in the land of the ward. Plaintiff's counsel say that they urged that she convey her dower interest to the ward, and this was finally agreed upon. A deed was drawn and submitted to her counsel for approval, but he refused to consider or approve it until plaintiff should pay him $100,

which it did. It paid other incidentals, amounting to $10.60, and $1,200 to its counsel, and for these items it brought this action.

Defendant's counsel question the foregoing statement in some respects. They say that her property, aside from the dower interest, was worth $11,000, and was mortgaged for a sum not exceeding $5,500; that Moore & Moore did not propose her conveyance of her dower interest to settle her ward's claim, but that proposition originated and was carried out by and through the efforts of her counsel and Mr. Yerkes, the ward's next friend; that the statement that Mr. Maloney required $100 as a condition to his approval of the deed is inaccurate. Mr. Maloney's testimony is as follows:

"*Q.* Will you state the circumstances of your receiving $100?

"*A.* I sat in my office one afternoon in connection with this matter after the general arrangement had been made. I do not remember whether it was Mr. Moore or Mr. McBryan called me up and asked me to get this deed by which Mrs. Munroe was to convey her dower interest under this court order, and I find that there was a petition filed there to sell her dower interest in this property.

"*Q.* Who prepared that petition?

"*A.* I prepared it.

"*Q.* Did Mr. Moore have anything to do with the preparation of that petition?

"*A.* None, whatever, and, as I say, I don't remember it. I said, 'I have been bothered with this case so much, and I have been called so much, I think you people ought to pay me for my time,'—I do not know whether Mr. Moore or Mr. McBryan, I am talking now as I have refreshed my recollection—'you ought to pay me for my time.' He said, 'What do you want?' I said, 'Send me a check for $100, and I will send the deed out.'

"*Q.* Did he send it over?

"*A.* Yes; he said he would call up Mr. Moore, and he called Mr. Moore, and he sent it over, and Bishop and I thought it a good joke.

"*Q.* You think this $100 was ever paid you by the company?

"*A.* When I made the suggestion, I made it more as a

joke on my part; but I said I had been annoyed so much by Mr. Moore and Mr. McBryan calling me up over the telephone. I had been annoyed; he called me up seven or eight times a week. Their number is 388, and every time I would go out and come back I would find a note on my desk to call that number.

"*Q.* This is the $100 charged your client?

"*A.* Yes, sir.

"*Q.* And you made this charge to this company?

"*A.* Undoubtedly.

"*Q.* Is there anything else you think of?

"*A.* The only thing I think of is there was not any time in connection with this account when the bonding company was in danger."

They claim that plaintiff was never in any danger, and that no interference by the plaintiff was necessary, and that Mr. Yerkes and Mr. Maloney would have taken care of their interests; that—

"Mrs. Munroe's contract was to hold the plaintiff harmless in case it lost anything (and there is no claim that it lost anything), and the jury had a right to say whether there was reasonable ground to believe that they would lose anything."

The undisputed evidence shows that, aside from her dower interest, defendant had an equity of $5,500 nominal, and undoubtedly less actual, value, if dependent upon a forced sale. Her dower was subject to the danger of her death, which would have instantly terminated it. We think that plaintiff was justified in going to such expense as was necessary to ascertain what the situation was, to protect itself against further liability, and avoid liability already incurred, so far as it could be done by legitimate means, and that under the application and guaranty it had a right of action for such reasonable expenses and attorney's fees as were paid in the legitimate pursuit of immunity from an obviously threatened loss. It was error to allow the jury to find that expenses were unnecessary, or that the right to recover them could be lost by the action of other attorneys, especially in view of the fact that action by filing petition preceded their inter-

vention, and that the settlement and execution of the deed seems to have depended at last on payment of $100 by plaintiff to the defendant or her attorney.

If there was a question of the reasonableness of the charges, it was for the jury; but, as the jury did not reach that question, there is no occasion to discuss it further.

The judgment is reversed, and a new trial ordered.

OSTRANDER, C. J., and BIRD, MOORE, and McALVAY, JJ.. concurred.